IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRODERICK PATTERSON,      *
        Plaintiff,

    v.              *    CIVIL ACTION NO. DKC-14-26

GLADHILL, JR., et al.,        *
        Defendants.
                 ***

## MEMORANDUM OPINION

Pending is a Motion to Dismiss, or in the Alternative Motion for Summary Judgment filed by Defendants, Wayne Webb, Warden of the Maryland Correctional Institution Hagerstown (MCIH) and MCIH Correctional Officers Robert Gladhill, Joshua Snyder, Galvin Boward, Kimberleigh (Vincent) Bowders, Peter Grossnickle, Gregory Wynkoop, Timothy Manuel, Robert Martin, Ryan Lewis, Sarah Emerick, Tyrell Wiland, Nicholas McGowan, Sean Pumphrey, Mark Donia, Daniel Atherton, Christopher Grubbs, and Jeremy Mason.[1]  ECF No. 20.  Plaintiff has responded.  ECF Nos. 22, 24, 30, 33, 36 & 40.[2]  Upon review of the papers and exhibits filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below, the dispositive motion, construed as a Motion for Summary Judgment, will be granted.

### Background

Plaintiff Broderick Patterson, an inmate currently held at the Jessup Correctional Institution ("JCI"), filed the instant civil rights complaint alleging that on September 24, 2011, while housed at MCIH, Officer Gladhill, severed Plaintiff's finger in a steel grill which required

---

[1]  The Clerk shall amend the docket to reflect the full and complete spelling of Defendants' names.  The Motion has not been filed on behalf of Tasker who has retired from State employment.  For the reasons that follow, even if Tasker had properly been served with the Complaint, Plaintiff's claims against him would be subject to dismissal.

[2]  Plaintiff's claim that the Internal Investigation Unit failed properly to investigate the injury to his finger, first raised in his opposition to the pending dispositive motion, is not properly before the court and shall not be considered.

multiple surgeries to repair.  ECF No. 1, p. 4.  Plaintiff alleges that Gladhill "was negligent and responsible for the use of excessive force and pain and suffering, because he failed, in accordance with institutional policy, to use caution while opening and closing the 900 lb steel grille...."  *Id.*

He claims that inmates at MCIH were afraid to file grievances due to fear of retribution from staff; however, he states that he filed a grievance regarding the injury to his finger on October 8, 2011.  *Id.*  Plaintiff alleges that a campaign of harassment, interference with medical care, and retaliation followed the filing of his grievance and did not stop until he was transferred from MCIH on March 1, 2013.  *Id.*, p. 4.  Plaintiff alleges that he was ridiculed by evening correctional staff about the injury to his finger and an unnamed staff member told him that the finger incident was regularly discussed and joked about at staff roll call and briefings on the evening shift.  *Id.*

Plaintiff states that the Administrative Remedy Procedure ("ARP") at MCIH was rarely followed and that often after filing a complaint against staff he would suffer retaliation.  Plaintiff claims that Warden Webb had actual knowledge of the retaliation and that Plaintiff's rights were violated given that he spoke with Webb concerning the harsh treatment he received from the evening shift.  Additionally, Plaintiff states that Webb signed off on the ARP regarding denial of his medical diet and that Webb contributed to the denial of Plaintiff's constitutional rights due to his inaction regarding Plaintiff's complaints.  *Id.*, p. 5.

Plaintiff alleges that, on October 5, 2011, Officer Snyder refused to allow him to go to the medical department to receive scheduled analgesic pain medication for his finger injury.  When Plaintiff protested, Snyder advised him to "write it up."  *Id.*  Thereafter, Snyder wrote Plaintiff multiple false infractions, resulting in ten days of cell restriction.  *Id.*  The following

day, Plaintiff was called into Lt. Boward's office to discuss the infractions written by Snyder. *Id*., p. 6.  Plaintiff states that he was advised that if he did not agree to the ten day cell restriction, and chose to have a hearing instead, Boward would insure that Plaintiff's punishment would be more severe.  Plaintiff states that Boward contributed to the loss of privileges and diminished his quality of life due to cell restriction.  He states that Boward had responsibility as a supervisor to be fair and impartial and that Boward violated Plaintiff's right to due process.  He claims that the false infraction "directly attributed [contributed] to the Plaintiff not being release[d] on parole." *Id*.

Plaintiff alleges that, on November 8, 2011, Officer Tasker denied him access to the medical department to have the dressing on his finger changed.  Plaintiff states that the delay in having his dressing changed caused him "an extreme amount of pain and suffering." *Id*.  He claims that Tasker subsequently wrote a false infraction due to Plaintiff's reputation of complaining about the denial of access to medical care and harassment which, "had a direct impact on extending the Plaintiff's time in prison." *Id*., p. 6.  Plaintiff further alleges that the infraction written by Tasker violated institutional policy because it was not signed or authorized by a shift commander or supervisor. *Id*., p. 7.  Nonetheless, Plaintiff was sanctioned at a formal hearing on December 1, 2011, to additional cell restriction. *Id*.

Plaintiff claims that, on March 9, 2012, and on a number of occasions thereafter, he was denied his medically prescribed diet by Officer Vincent and other unnamed staff. *Id*., p. 7.  Vincent told Plaintiff he would not get dinner so long as he was housed at MCIH and that he could file a grievance about it. *Id*.  Plaintiff states that he informed Webb of the issue with his medial diet.  He alleges that from March 9, 2012 through August 8, 2012, he was deliberately denied his medically prescribed diet at dinner, causing him extreme hunger, weakness, cramps

and lightheadedness.  Plaintiff states that Vincent and Webb were responsible for violating DOC policy to insure that he received the medically prescribed diet.  *Id.*

On May 26, 2012, Plaintiff was released to the medical unit for a routine dressing change. When he arrived he was told by Officer Grossnickle that "your kind is not welcome up here." *Id.*, p. 8.  Plaintiff was unable to have his dressing changed, resulting in emotional stress, pain and suffering.  *Id.*  While returning to his housing unit, Plaintiff encountered Sgt. Wynkoop and advised Wynkoop he had been denied access to the medical unit.  Wynkoop stated "file a complaint you retard," before ordering Plaintiff to place his hands on the wall and submit to a strip search.  Plaintiff alleges that as a supervisor Wynkoop should have insured his access to the medical unit and that his search was arbitrary.  *Id.*, p. 8.

The following day, Plaintiff filed a grievance against Wynkoop and Grossnickle concerning the May 26, 2012 incident.  After filing the grievance, "more extreme incidents of harassment, retaliation, and the denial of medical access began."  *Id.*, p. 9.  Wynkoop filed a false infraction against Plaintiff which resulted in 60 days of disciplinary segregation and a denial of parole.  Plaintiff states that his due process rights were violated due to Wynkoop's malicious actions and that given his disciplinary segregation sentence, he was deprived of his liberty, property, access to religious services, outdoor recreation, and access to the library.  His complaints to Webb were dismissed.  *Id.*

Plaintiff alleges that, from May 27, 2012 to June 10, 2012,[3] he was not permitted, by unnamed officers, to go to the medical unit for dressing changes for his finger injury.  *Id.*, p. 9.

On June 1, 2012, Plaintiff was called to Captain Manuel's office to discuss his ARP regarding Wynkoop and Grossnickle's denying him access to medical treatment.  *Id.*  Plaintiff

---

[3] It appears that Plaintiff was released for a dressing change on June 7, 2012.  *Id.*

4

states that he was instructed to sign several affidavits regarding the time he was released from his housing unit to go the physician.  Manuel also attempted to force Plaintiff to sign off on his grievance but Plaintiff declined to do so.  Manuel then "produced a typed and signed and possibly forged letter" from medical staff indicating that the order for daily dressing changes had been discontinued.  *Id*.  Plaintiff alleges that Manuel contributed to the denial of medical treatment in that he knowingly acquiesced to the behavior of his subordinates.  *Id*.

Plaintiff states that, on July 27, 2012, shift commander Captain Martin approved Plaintiff's placement on segregation at Wynkoop's request.  *Id*., p. 11.  Plaintiff states that Martin had a duty to investigate Wynkoop's accusation that Plaintiff had "hot urine" in a coffee mug.  Plaintiff states that his placement on segregation denied him due process, access to the library, and deprived him of privileges including recreation and showers.  He also alleges that he was "consistently denied food and vital medication" and Martin was aware of the denials and failed to stop the violations.  *Id*.

Plaintiff states that, on January 7, 2012, Officer Mason observed him going to the medical department.  Mason instructed Plaintiff to place his hand on the wall, pull his pants and underwear down, and spread his legs.  Mason stated he wanted to see if Plaintiff possessed contraband.  Plaintiff states that Mason previously denied him access to the medical department.  Mason instructed Plaintiff to go to his housing unit and file a complaint.  Plaintiff states that Mason's strip searches were unrelated to security and without justification.  *Id*.  Plaintiff filed a grievance which was dismissed due to lack of evidence.  Plaintiff maintains that Mason's retaliatory conduct continued until he was transferred from MCIH on March 1, 2013.  *Id*.

Plaintiff states that from May 27, 2012 to June 12, 2012, he was denied access to a shower.  *Id*., p. 12.  Plaintiff claims that Officer Grubbs "contributed" to these deprivations.

Plaintiff filed a grievance and was advised by Webb that he needed to submit more information. Plaintiff states that he submitted the additional information but his grievance was dismissed. *Id*., p. 12. Plaintiff states that Grubb and other unnamed officers violated DOC policy by not permitting him to attend to his personal hygiene. *Id*. Plaintiff further alleges that Grubb wrote a false infraction against him, causing him to be denied parole. *Id*.

Plaintiff states that, on October 3, 2012, he was released from his cell to get his medication; however when he got to the medical unit his identification was required. Plaintiff stated that often he did not need to produce his identification as medical personnel knew him. Plaintiff started back to his housing unit to retrieve his identification. On the way back to the medical unit, Officers Lewis and Emerick directed him to return to his cell, denying him access to his medication. Plaintiff states that he attempted to advise the officers that medical personnel had told him to get his identification but the officers simply told him to "write it up," knowing that the grievance would be returned in their favor. *Id*., p. 13.

Plaintiff claims that Lewis wrote false infractions against him after he asked for a blank ARP form to file a complaint. Plaintiff states that the false infraction affected his release on parole and prolonged his time in prison. He also states that he spent six months in segregation. *Id*.

Plaintiff alleges that on October 13, 2012, at the direction of Lewis and Emerick he was called to the "back keys" area of the prison and placed into a segregation cell by Officers Wiland and McGowan. Wiland and McGowan went to Plaintiff's cell and confiscated his "jailhouse lawyers' manual," as well as his composition books detailing his unjust treatment at MCIH. *Id*., p. 14. Plaintiff states that several of his ARP grievance receipts and complaints against MCIH staff were also taken. He states that he voluntarily dismissed his federal law suit because the

documentation was confiscated and he was unable to rebut the "defendants['] possible motion for summary judgment." *Id*.

Plaintiff claims he was taken to segregation for 180 days.  He alleges that the officers violated DOC policy by not providing him a property inventory or confiscation slip.  Plaintiff states that his right to access the court and to due process were violated.  He also states that the officers wrote a false infraction which prevented him from being released on parole and restricted him to segregation which adversely affected his psychological state.  Plaintiff states that he had to be prescribed more effective and potent psychotropic medication due to his deteriorating mental, emotional and psychological state.  *Id*.

Plaintiff further claims that he suffers from a chronic case of ulcerative colitis which results in rectal bleeding.  Plaintiff states that his condition was exacerbated by the denial of dinner meals, lack of access to medication, and emotional distress brought on by the harassment of the evening staff.  *Id*., p. 15.

On January 31, 2013, while housed in segregation, Plaintiff requested emergency medical attention as he had been passing blood rectally and had difficulty breathing.[4]  Officer Pumphrey advised Plaintiff that he had notified supervising officers Donia and Atherton of Plaintiff's request.  *Id*.  Plaintiff states that he fell unconscious and some hours later was roused by Officer Hinton, who had been called to the cell by Plaintiff's cellmate.  When Hinton took Plaintiff to the medical department, Plaintiff observed the second shift officers laughing at him.  *Id*.

.        Plaintiff states that when he arrived at the infirmary he was so weak he passed out again, smacking his head on the sink.  *Id*., p.  15.  Hinton found Plaintiff passed out on the bathroom floor and again assisted him in obtaining access to care.  Plaintiff was examined and admitted to

---

[4]  Plaintiff alleges, for the first time in his opposition, that he "submitted daily sick calls and, for the entire month of January, remained in the cell on a bunk unable to shower, eat or partake in the minimal allowed recreation."  ECF No. 40-1, p. 15.

the infirmary by Dr. Ali.  Plaintiff states that the medical director recommended that Plaintiff's condition be videotaped by correctional staff and he was in fact recorded by Lt. Reed while in the infirmary.  *Id*.

In an amended complaint filed May 19, 2014, Plaintiff alleges that on May 13, 2014, he was denied his lunch by an unidentified officer.  He states that their "racial contempt" and indifference to not feeding him were "palpable."  ECF No. 13.

In a supplemental complaint filed June 11, 2014, Plaintiff alleges that on May 1, 2014, he was transferred from the Dorsey Run Correctional Facility ("DRCF") after complaining of lack of access to a library.  ECF No. 16.  He states that his property was improperly confiscated.  He alleges that the actions were retaliatory and that he was then transferred to the Maryland Correctional Training Center ("MCTC") and placed on administrative segregation without justification, where he was "placed in an eight by ten foot cell for 23 hours a day, allowed two showers per week, no access to a telephone, library and sometimes medical diet."  *Id*.  He states that he is treated differently than other prisoners.  *Id*.  He claims that in violation to DOC policy he was not seen by a case management team.  *Id*.

Defendants provide the following information in support of their motion.

A.      Injury to Plaintiff's finger

On July 25, 2011, Plaintiff was transferred to MCIH.  ECF No. 20-5, p. 5.  On September 24, 2011, Gladhill was overseeing recreation when he announced "lock-in" for D-1 Tier.  ECF No. 20-6, p. 2.  Gladhill opened the recreation hall grille.  Three inmates came out to lock in and Gladhill closed the grille.  Gladhill noticed Plaintiff jump back away from the grille holding his hand, which was bleeding.  Plaintiff suffered a crush amputation of the first digit of his left middle finger.  *Id*.  Gladhill telephoned the institutional hospital and reported what had

happened.   Plaintiff was escorted to the hospital for treatment.   The amputated digit was recovered, placed in ice and taken with Plaintiff to the hospital.   *Id*.   Ultimately, Plaintiff was transported to Meritus Medical Center, where his finger tip was reattached with sutures.   *Id*.

Plaintiff received extensive follow-up care for the injury including regular wound care. ECF No. 20-7 (Plaintiff's medical records filed separately as Exhibit 3).   On May 11, 2012, Dr. Herrera, the plastic surgeon who treated Plaintiff noted that, although some stiffness was noted, the site was fully healed and Plaintiff's range of motion in the digit was moderately limited.   *Id*., p. 153.   On July 19, 2012, Dr. Herrera noted that the digit was well-healed, the edema was well controlled, and Plaintiff's range of motion was good.   *Id*., pp. 145-46.   Plaintiff's medical records reflect that on certain dates he refused to report to the medical department for wound care or refused the offered treatment.   *Id*., pp. 286, 310, 322, 324, 325, 333.

The Internal Investigation Unit was notified of the incident regarding the closing of the grille on Plaintiff's finger.   No formal investigation was undertaken.   ECF No. 20-6, pp. 2-3, 5-6, 8; ECF No. 20-8.   After a review of the incident reports generated, it was determined that all actions in regard to the incident were in accordance with established directives and policies and that Gladhill accidently closed the door on Plaintiff's hand.   There was no information to suggest any criminal intent on the part of Gladhill.   ECF No. 20-8.

Plaintiff filed ARP MCI-H #0662-11 on October 8, 2011, alleging that Gladhill allowed six inmates to pass through the grille door to shower before he would close the door and allow others to pass through.   ECF No. 20-10, p. 1.   Plaintiff states that when "Gladhill closed the grille door to prevent more than six inmates from passing through Plaintiff had his hand 'resting in its

jamb.'" *Id*, p. 1.  The ARP was dismissed without addressing the claim against Gladhill.[5]  *Id*., pp. 1, 4-8.  Plaintiff appealed, complaining that his complaint against Gladhill had not been addressed.  *Id*., p. 10.  The appeal was dismissed stating that Plaintiff's underlying ARP did not complain about negligence on the part of Gladhill.  *Id*., p. 11.

B.      October 5, 2011 incident

On October 5, 2011, Snyder issued Plaintiff a ticket for being out of bounds when Plaintiff was not present for count.  ECF No. 20-9, p. 3.  Plaintiff advised Snyder that he needed his mid-day medical pass and Snyder permitted him to go the medical department.  *Id.; see also*, ECF No. 20-7 (Plaintiff's medical records filed separately as Exhibit 3), pp. 43 & 71.  Plaintiff was also seen in the medical department that morning.  *Id*., pp. 113-117.  The infraction was informally resolved, with Plaintiff sanctioned to ten days cell restriction.  ECF No. 20-9, p. 3.

Plaintiff's ARP MCI-H #0662-11 filed on October 8, 2011, alleged that Snyder wrote a false infraction against him and that Boward told Plaintiff that if he did not sign the infraction he would insure Plaintiff received a lot of lockup time.  ECF No. 20-10, p. 2.  The ARP was dismissed after finding that Plaintiff received his medication on October 5, 2011, and no evidence of inappropriate behavior on the part of Boward or Snyder could be found.  *Id*., pp. 1, 4-8.

C.      November 9, 2011 incident

At approximately 8:30 p.m. on November 9, 2011, Tasker permitted inmates on Tier D-1 with medical passes to leave the tier.  ECF No. 20-11, p. 3.  Shortly thereafter, Plaintiff came into the tier office, yelling at Tasker that he "was in big trouble" for denying him his 8:00 p.m. medical pass.  *Id*., p. 3.  Plaintiff told Tasker that he did not report for his medical pass but rather

---

[5] In addition to this claim against Gladhill, Plaintiff included in his ARP the allegation regarding the October 5, 2011 incident with Snyder.  *Id.*

had reported to the second floor hospital.  Tasker advised Plaintiff that he had already called the second floor and the time of Plaintiff's pass had been changed to 10:00 p.m.  Plaintiff was directed to return to his cell.  *Id*.

Later that evening Tasker went to Plaintiff's cell and discovered that Plaintiff had covered the window.  Tasker ordered Plaintiff to remove the window covering but Plaintiff refused and called Tasker a liar.  *Id*.  Tasker wrote Plaintiff a notice of inmate rule violation for violating rules #313 (failing to obey a specifically cited rule); #400 (disobeying a direct lawful order), and #302 (being out of bounds).  *Id*.  The adjustment hearing was held on December 1, 2011.  *Id*., p. 5 Plaintiff requested and received an informal disposition of ten days of cell restriction, which was approved by Warden Sowers on December 2, 2011.  *Id*., pp. 1-2, 5-9.

D.     January 7, 2012 incident

Plaintiff filed ARP MCI-H #0029-12 on January 25, 2012, complaining that Mason harassed him by subjecting him to a strip search on January 7, 2012.  ECF No. 20-12, p. 1.  The ARP was dismissed as there was no evidence to support Plaintiff's allegations that he was treated inappropriately by Mason.  *Id*., pp. 1, 7, 10, 14.

E.     Plaintiff's diet

Plaintiff's medical order for a 2400 calorie diabetic diet expired on March 8, 2012.  ECF No. 20-13, p. 1.  MCIH Food Services Department did not receive a renewal order from the medical department until August 1, 2012.  When the Department received the order, the medical diet was resumed.  *Id*.

Todd Hull, Correctional Dietary Manager, avers that Plaintiff was screened in the medical department on March 15, 2012 and June 7, 2012, for a medical diet; however Plaintiff's paperwork was not forwarded to MCIH Food Services until August 1, 2012.  *Id*; *see also* ECF

No. 20-14; ECF No. 20-7 (Plaintiff's medical records filed separately as Exhibit 3), pp. 6, 137-38, 157, 174-75, 179, 181-183, and 354.

Plaintiff filed a grievance with the Inmate Grievance Office ("IGO)" complaining that he did not receive his 2400 calorie diet meals at breakfast and lunch from May 7-11, 2012, which he alleged were prescribed to him on March 15, 2012.  ECF No. 20-15.  A hearing was held before Administrative Law Judge ("ALJ") Marina Sabett who found that while it was not disputed that Plaintiff failed consistently to receive his dinner meal in accordance with his prescribed 2400 diabetic diet during the March 9 through August 8, 2012 time frame, he could prove no prejudice as a result.  *Id*., p. 6.

On March 25, 2014, Plaintiff was transferred from RCI to the DRCF.  ECF No. 20-5, p. 1. Medical records show that on April 3, 2014, a diet card was issued for a 2400 calorie diet from February 18 through May 18, 2014.  ECF No. 20-27, p. 1.  On May 1, 2014, Plaintiff was transferred from DRCF to MCTC.  Upon his transfer his medical record was reviewed.  ECF No. 20-5, p. 1; ECF No. 20-27, p. 3.  Plaintiff was seen by Dr. Contah Nimely on May 14, 2014 for a chronic care visit.  *Id*., pp. 4-5.  On May 20, 2014, Dr. Nimely completed a diet change form for a 2400 calorie diabetic diet for one year.  *Id*., p. 6.

Sgt. Ricker, officer in charge of Housing Unit (HU) #5 at MCTC, avers that on May 28, 2014, he learned that Plaintiff alleged he did not receive lunch meals on May 13 and 14, 2014. ECF No. 20-29.   Ricker avers that Plaintiff did not advise him or any officer under his supervision that he did not receive lunch meals on those dates, nor did Plaintiff file an ARP regarding this allegation.  *Id*.  Ricker further avers that he spoke with Plaintiff on May 29, 2014, and Plaintiff advised that while he did not receive his medically prescribed diet during the lunch meal on those two dates, he had not had a problem since that time.  *Id*.  Plaintiff signed an

Inmate Statement indicating he did not receive his medically prescribed diet on May 13 and 14, 2014, but that after complaining to Officer Wade, the problem was resolved.  ECF No. 20-31. Plaintiff further advised that the officer who failed to provide him his diet tray was not an officer normally assigned to HU5 and was filling in on those two days.  *Id.*

F.      May 26, 2012, incident

On May 26, 2012, at approximately 8:10 p.m. Grubbs received a call from the institutional hospital, located on the second floor of the institution, requesting Plaintiff report. ECF No. 20-16, p. 4.  Grubbs advised medical staff that he sent Plaintiff to the hospital at 6:45 p.m. with inmates who had passes for 7:00 p.m.  *Id.*  Staff searched for Plaintiff and located him in the "Annexes" on the south side of the institution.  Yard movement was delayed due to Plaintiff being out of bounds.  *Id.*  Plaintiff was served with a notice of inmate rule violation charging him with violation of rules #312 (interfering with or resisting the duties of staff) and #402 (being out of bounds).  His adjustment hearing was held on May 31, 2012, and he was sanctioned to 30 days of cell restriction.  *Id.*, pp. 1, 8-11.  Plaintiff appealed; however, Webb approved the hearing officer's decision and sanctions.  *Id.*, pp. 2, 12-13.

Plaintiff filed ARP MCI-H #0307-12 on May 29, 2012, alleging that on May 28, 2012, he was not released timely from his cell for his scheduled dressing change, which resulted in his being denied access to the medical department by the officer on duty.  ECF No. 20-17, p. 1.  The ARP was dismissed for a procedural reason pending resubmission.  Plaintiff resubmitted the ARP on June 2, 2012; however, in his resubmission he indicated he was denied entry to the medical department on May 26, 2012. ECF No. 20-18.  The ARP was investigated and dismissed with a finding that Plaintiff was not seen in medical on May 26, 2012, due to his actions of going to the yard instead of reporting properly for his medical appointment as scheduled.  *Id.*, p. 1, 26.

Additionally, Nurse Smith reported that Plaintiff's wound no longer required daily dressing changes. *Id.*, p. 9.

G.      Dressing Changes

Plaintiff filed ARP MCI-H #0337-12 complaining that Nurse Hendershot discontinued the surgeon's order for daily dressing changes. ECF No. 20-19, p. 5. Investigation revealed that Plaintiff received regular, if not daily, wound care changes during the dates at issue. Additionally, it was noted that Plaintiff signed off on treatment on June 1, 2012, which resulted in the suspension of his wound care until the physician could meet with him. *Id.* The alleged letter from Hendershot suspending treatment could not be located and no evidence was found of its existence or that it affected Plaintiff's medical care. *Id.* Plaintiff filed an appeal which was found meritorious in part as the institution failed to provide documentation that Plaintiff "signed off" on wound care on June 1, 2012. *Id.*, p. 4. A Release of Responsibility ("ROR") was prepared on June 1, 2012 by Hendershot at 8:37 p.m., although it was not executed by Plaintiff. *Id*, p. 15. On June 7, 2012, in response to a sick call slip dated June 2, 2012, the physician noted that a ROR was signed on June 1, 2012. ECF No. 20-7, (Plaintiff's medical records filed separately as Exhibit 3), p. 158.

H.      July 27, 2012 incident

On July 27, 2012, Plaintiff was served with a notice of inmate rule infraction issued by Wynkoop for refusing to pour out a liquid Plaintiff described to Wynkoop as "hot piss." ECF No. 20-20, p. 6. Plaintiff told Wynkoop he was HIV positive and better get tested after Wynkoop ordered Plaintiff to turn over the liquid and some of the contents spilled on the officer's hand. *Id.* Wynkoop directed Plaintiff again to pour out the liquid but Plaintiff put the container to his mouth and drank it. During the encounter Wynkoop asked to see Plaintiff's

library pass, as that was where Plaintiff reported he was going. Plaintiff was unable to produce the pass and after checking the pass list, Wynkoop determined Plaintiff had no pass for the library. *Id.*, p. 6. Plaintiff was charged with violating inmate rule #312 (interfering with or resisting the duties of staff), #400 (disobeying a direct lawful order), and #403 (knowingly providing false information). *Id.*

Plaintiff was placed on administrative segregation pending his adjustment hearing due to his continued failure to conform to the rules and regulations of the institution. ECF No. 20-21, p. 1. It was noted that Plaintiff attempted to gain access to unauthorized areas by providing staff false information and that he displayed disregard for institutional rules and regulations. It was further recommended he be placed on the transfer list. *Id.*, p. 2.

After an adjustment hearing held on August 7, 2012, Plaintiff was found guilty of the rule violations and sentenced to a total term of 60 days disciplinary segregation. ECF No. 20-20, p. 1, pp. 9-13. The Warden affirmed the hearing officer's decision. *Id.*, pp. 2-3.

I. October 13, 2012 incident

Plaintiff was observed by Lewis and Emerick on October 3, 2012, at approximately 9: 15 p.m. entering the medication line from another area. A few minutes later he was observed ascending and descending A and B stair, disappearing and reappearing. ECF No. 20-22, p. 3. As he was ascending A stairway, Lewis directed Plaintiff to return to his cell but Plaintiff refused, stating he was going to the medication line. *Id.*, p. 3. Lewis told Plaintiff that he had been seen going to the medication line twice that evening and again directed Plaintiff to return to his cell. Plaintiff responded that Lewis could not deny him his medication. Lewis responded that he should have received his medication during one of his previous trips to the medication line. When Plaintiff refused Lewis' direct order to return to his cell, Lewis asked to see

Plaintiff's identification. As Plaintiff handed Lewis his identification, he stated he was going to write an ARP. Lewis advised him to put his name and Officer Emerick's name on the ARP. Plaintiff responded "I'll put you somewhere Lewis. I'll put your fucking ass on the ground!" *Id*. He then ran back up B stairway and Lewis called his supervisor and informed him of the incident. *Id*. As a result, Plaintiff was charged with violating inmate rules #104 (use of threatening language), #312 (interfering with or resisting the duties of staff), #400 (disobeying a direct lawful order), and #405 (any exhibition, demonstration or conveyance of insolence, disrespect, or vulgar language). *Id*.

At the adjustment hearing held on October 25, 2012, Plaintiff pled guilty to violating rules 104, 400 and 405. *Id*., p. 7. He was sanctioned with 180 days of disciplinary segregation and revocation of 120 good conduct credits. *Id*., pp. 8-9. The hearing officer's decision was affirmed by Webb on November 13, 2012. *Id*., p. 1.

J.     October 13, 2012 loss of property

McGowan avers that to the best of his knowledge he has had no dealings with Plaintiff. ECF No. 20-23. He does not recall confiscating or inventorying Plaintiff's property on October 13, 2012. *Id*.

K.     January 31, 2013 treatment of ulcerative colitis

On January 31, 2013, Plaintiff was admitted to the infirmary for a flare up of his ulcerative colitis. He complained of abdominal cramps and bloody diarrhea, and exhibited signs of dehydration. ECF No. 20-7, (Plaintiff's medical records filed separately as Exhibit 3), p. 361. Plaintiff remained in the infirmary until he was discharged back to his housing unit with medication the following day, February 1, 2013. *Id*., pp. 361-372, 413-428. Infirmary records

reveal that Plaintiff was arrogant and argumentative at the time of his discharge, requiring four officers to escort him from the infirmary back to his cell. *Id*., pp. 353, 413, 416, 418, 420.

Plaintiff returned to sick call for follow-up that night. He advised Nurse Smith that he needed a mattress. When she told him they were only discussing sick call related issues, he became verbally aggressive and argumentative and walked out of the appointment. *Id*., p. 412.

On February 3, 2013, Plaintiff reported to sick call for follow up regarding his colitis. He stated he did not want to be seen as the issue had been addressed. *Id*., pp. 410-11. Plaintiff offered no other complaints, refused to sign an ROR, and walked out of sick call. *Id*., p. 410. On February 5, 2013, he again refused to report to sick call for follow up regarding his ulcerative colitis. *Id*., p. 409. Nonetheless, on February 7, 2012, he filed a sick call slip claiming he needed a blood transfusion and threatening medical staff with a lawsuit. *Id*., p. 358.

L.      Segregation confinement

Plaintiff was transferred from MCIH to RCI on February 28, 2013. On March 1, 2013, his medical records were reviewed by Kristine Geowey, R.N. *Id*., pp. 403-05. Amber Ward, Licensed Clinical Professional Counselor, also reviewed Plaintiff's records that day. She noted Plaintiff had active orders for psychotropic medication and his most recent diagnosis was Schizoaffective Disorder. She noted he would be followed by Psychiatry and Psychology. *Id*., p. 402. Plaintiff received regular segregation reviews and a Security Reclassification Instrument was prepared on January 22, 2013. ECF No. 20-24.

M.      Parole consideration

Plaintiff's "Case Plan," dated May 2, 2011, noted he received three Category I infractions and had recently been released from a lengthy disciplinary segregation sentence for attempting to incite other inmates to engage in rebellious activity. ECF No. 20-25, pp. 4-6. It was noted that

Plaintiff needed to demonstrate more responsible decision-making and learn to obey the rules and accept authority. *Id.*, p. 4. It was also noted that Plaintiff had received no programming certificates, nor had he developed a consistent pattern of employment. *Id.*, p. 5. Two goals were listed for Plaintiff to work on: to develop associations with pro-social individuals and to improve his problem solving skills through anger management counseling. *Id.*, p. 4. It was noted by case management that Plaintiff had not made good use of his time during his incarceration and future infractions should result in the refusal of parole at his next hearing. *Id.*, p. 3. An appeal was noted, but denied, noting that the granting of parole would be premature and Plaintiff's case would be heard again in May of 2013. *Id.*, p. 1.

On April 30, 2013, case management again recommended refusal of parole because Plaintiff had not participated in cognitive groups and had received numerous infractions since his last parole hearing. ECF No. 20-26, pp. 2-5. Plaintiff's appeal was acknowledged but again denied, with a note that Plaintiff's failure to comply with recommendations given at his last hearing was a sufficient reason to deny parole. *Id.*, p. 1.

N.     April 30, 2014 Incident

On April 30, 2014, the day before Plaintiff was to be transferred from DRCF to MCTC, Officers Gebreys and Johnson were conducting count in A-Dorm. ECF No. 20-28, p. 6. As Gebreyes approached Plaintiff's cell for count, Plaintiff stated, "Bitch, I hate you. Get the fuck out of here." Gebreyes continued the count. When she reached the middle of A-Dorm, Plaintiff threw an ink pen and stated, "Bitch, I'll kill you." *Id.* Gebreyes notified Brewster of the incident and Johnson escorted Plaintiff out of the dorm. *Id.,* pp. 10-12. Plaintiff was charged with violating rules #100 (being involved in disruptive activity), #104 (use of threatening language),

#312 (interfering with or resisting the duties of staff), and #405 (any exhibition, demonstration, or conveyance of insolence, disrespect, or vulgar language). *Id.*

A hearing on the rule infractions was held on June 9, 2014. *Id.*, p. 6.  Plaintiff was found guilty of violating rules 104, 312, and 405 but not guilty of violating rule 100.  *Id.*  It was noted that Plaintiff's adjustment history was poor.  *Id.*, p. 7.  He was sanctioned with a total term of 365 days disciplinary segregation and, the loss of 365 days good conduct credits.  *Id.*  It was noted that the violation was Plaintiff's fourth rule 104 violation resulting in a 180 day suspension of visitation privileges from June 9, 2014 to December 5, 2014.  *Id.*, p. 8.  On appeal, the hearing officer's decision was affirmed.  *Id.*, pp. 1-2, 9.

**Standard of Review**

A.     Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint.  *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th  Cir. 1999).  The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007).  Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Id.* at 563.  The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

B.      Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether

20

there is a genuine issue for trial."   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.* at 248.   Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."   *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact.   No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

### Analysis

A.      Supervisory Liability

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983).   Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"   *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984).   Supervisory liability under § 1983 must be supported with evidence that:   (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct

21

that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).  Plaintiff's allegations against Webb are based solely on the doctrine of respondeat superior and cannot proceed.

B.      Excessive Force

Gladhill is entitled to summary judgment on Plaintiff's excessive force claim.  Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response.  *See Whitley v. Albers*, 475 U. S. 312, 321 (1986).  The absence of significant injury alone is not dispositive of a claim of excessive force.  *See Wilkens v. Gaddy*, 599 U.S. 34 (2010).  The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  *Id*. at 34.

Gladhill closed the grille in order to facilitate the movement of inmates from the yard back to their housing tier.  Plaintiff had his hand on the "jamb" of the door when his finger was inadvertently caught and his finger-tip severed.  There is no question that Plaintiff's injury was

serious, but the "force" employed was not malicious; rather, it was entirely inadvertent. Plaintiff claims that Gladhill shut the Grille in an effort to prevent more than six inmates from entering the area. ECF No. 40-1, p. 2; ECF No. 40-3. Assuming that was Gladhill's intention in closing the gate, such an intention does not evidence a malicious or sadistic desire to harm anyone. Any bald allegation by Plaintiff to the contrary is unsufficient to overcome Gladhill's motion.[6] Although the court may not make credibility determinations on summary judgment, *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir.1991), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007). A court may permit an inmate's claim to go to the jury only if the evidence, viewed in the light most favorable to the inmate, "supports a reliable inference of wantonness in the infliction of pain." *Stanley v. Hejirika*, 134 F. 3d 629, 634 (4th Cir. 1998).

C.      Interference with medical care

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need.

---

[6] In a statement provided by Plaintiff, inmate Howard Green who witnessed the incident, states that "the officer did not seem to have done it intentionally. He was just acting in haste to prevent more than the allowed six (6) inmates from getting into the shower." ECF No. 40-4. Other witnesses confirm that the incident was at most occasioned by Gladhill's negligence. *See e.g.*, ECF Nos. 40-4, 40-5, 40-6, p.1.

*See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure the needed care was available.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.  The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer*, 511 U.S. at 839– 40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844.   If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted."  *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *Brown v. Harris,* 240 F. 3d 383, 390 (4th Cir. 2001) citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

Even assuming that the need for analgesic medication and dressing changes a month after his injury, the receipt of a 2400 calorie diet, or treatment for ulcerative colitis individually constituted a "serious medical condition," there is simply no evidence that any of the named Defendants were deliberately indifferent to the treatment of these ailments.  Moreover, to the extent any treatment was interfered with, there is no evidence Plaintiff was injured as a result of the interference.  As such, Defendants are entitled to summary judgment.

Plaintiff was treated regularly for his finger wound.  The evidence before the court demonstrates that on the individual occasions where Plaintiff claims he was thwarted from going to the medical unit by correctional staff, his own actions prevented his receiving treatment. Plaintiff was regularly out of bounds or engaged in combative exchanges with correctional staff which impeded his ability to be seen by medical personnel.  Moreover, the record evidence demonstrates that on the occasions he alleges he was not allowed to go to the medical department for wound care and/or analgesic medication, custody staff believed he did not have an order for daily wound care, and/or had received pain medication previously that day.[7]  Even if the correctional Defendants impeded his treatment as alleged, there is no evidence that Plaintiff was injured as a result.

There also is no evidence that Defendants intentionally interfered with receipt of his medically prescribed diet, given that there was some confusion as to the validity of Plaintiff's order for a medically  prescribed diet from March 8, 2012 to August 1, 2012.  Plaintiff was

---

[7] Plaintiff alleges that the medication pain chart which indicates he received all prescribed medication on October 5, 2011, does "not reflect the correct dispensing scenarios."  He avers he was not permitted to get his pain medication on October 5, 2011 at 2:00 p.m. ECF No. 40-11, pp. 1 & 5.

The court is also mindful that the purported letter from Nurse Hendershot discontinuing Plaintiff's wound care on June 1, 2012 has not been produced.  That fact is however, not dispositive to Plaintiff's claim.  As noted above, even if Plaintiff's wound care was obstructed during the first week of June (medical records reveal Plaintiff received daily wound care during the last week of May and his wound care was resumed on June 7) there is simply no evidence of any injury arising therefrom.  Further, Plaintiff's medical records reflected that wound care was not needed daily and custody staff were entitled to rely on the information provided to them from medical staff.

specifically advised to contact medical personnel to address the lapse of the order for his diet. ECF No. 40-15, p. 1.  In the course of Petitioner's ARP appeal, the Commissioner found that a valid medical diet order began on March 15, 2012 with an expiration date of March 15, 2013. *Id.*, p. 5.  As noted, above, however, it does not appear that the medical order was timely delivered to the appropriate custody staff.  ECF No. 20-13, p. 1; *See also* ECF 40-15, pp. 12-13. Further, the non-delivery of his medically prescribed meals in May of 2013 were isolated instances in which the non-delivery appears to have been occasioned by an officer not typically assigned to the tier responsible for the distribution of the meal.

Plaintiff has failed to demonstrate any injury arising from the failure to deliver the medical prescribed meals.[8]  Plaintiff complained at his IGO hearing that as a result of not receiving his prescribed diet he was lethargic, slept a great deal, had splitting headaches, and was stressed; however he never visited a doctor to address these symptoms.  The ALJ found Plaintiff had not demonstrated any injury as a result of the non-delivery of his medical diet.  ECF No. 40-15, p. 12-13.

Lastly, the facts before the court show that Plaintiff received timely and appropriate care for the flare up in his ulcerative colitis in January of 2013.  Correctional staff responded promptly and transported Plaintiff to the medical unit for care.  Plaintiff alleges he told custody staff he required medical care at approximately 6:00 p.m.  Records reflect he was seen by Nurse Nguimbus at 9:51 p.m. ECF No. 40-24, p. 2.  To the extent any Defendants delayed treatment of Plaintiff's initial complaints, there is no evidence that Plaintiff was injured by few hours delay in receiving treatment.

---

[8] Plaintiff's bald claim (ECF No. 40-1, p. 15) that the interference with his medical diet exacerbated his ulcerative colitis finds no support in the medical record.  Additionally, Plaintiff did not complain of an exacerbation of colitis at his IGO hearing and it is noteworthy that the flair up occurred nearly six months after his medical diet was reinstituted.

D.    False infractions/Disciplinary Proceedings

In prison disciplinary proceedings which bring the possible loss of good conduct credits, a prisoner is entitled to certain due process protections. *See Wolff v. McDonnell*, 418 U.S. 539, 564 (1974). These include advance written notice of the charges against him, a hearing, the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision. *Wolff*, 418 U. S. at 564-571. Substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *Superintendent, Mass. Correctional Institute v. Hill*, 472 U.S. 445, 455 (1985).

Plaintiff characterizes the infractions as "minor" and states his belief that other inmates would not have been written up for the same conduct. ECF No. 40-1, p. 6. The court does not find Plaintiff's repeatedly being out of bounds, refusal to follow direct orders, and threats to staff "minor" offenses. Regardless of the nature of the rule violations, Plaintiff received all the process he was due. He was given timely advance written notice of each infraction and permitted to attend the disciplinary hearings. The hearing officer's determination of guilt was based upon some evidence, i.e. review of Plaintiff's testimony[9] or, in the case of the October 13, 2012 incident, his guilty plea, the officer's testimony or written averments concerning the incident, and the written record.

To the extent Plaintiff claims that his confinement to cell restriction and/or administrative segregation resulting from the infractions violated his rights, his claim also fails. As noted, *supra*, Plaintiff received all the process he was due in regard to each of his rule infractions. In *Sandin v. Conner*, 515 U.S. 472 (1995), the Court refocused attention on the nature of the deprivation, stating that a liberty interest may be created when state action imposes an "atypical

---

[9] As to the August 7, 2012 incident Plaintiff, while maintaining that the ticket was retaliatory, admitted during the hearing that he refused to give Wynkoop his pass and also drank the tea after he was directed to pour the liquid out. ECF No. 40-19, p. 3.

and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The reasoning of the Court in *Sandin* requires that the due process inquiry focus on the nature of the deprivation alleged and not on the language of particular prison regulations. *Id.* No liberty interest is implicated when prisoners are placed on administrative segregation or punished with cell restriction. *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997); *Reffitt v. Nixon*, 917 F. Supp. 409, 413 (E.D. Va. 1996). Plaintiff has not alleged that the conditions of segregation or his brief assignments to cell restriction were significantly more onerous than those of general population. *See Beverati,* 120 F.3d at 504 (conditions of administrative segregation at Maryland Penitentiary); *Knox v. Lanham*, 895 F. Supp. 750, 758-59 (D. Md. 1995) (administrative segregation at Eastern Correctional Institution). As noted above, any violation of Division of Correction directives in connection with Plaintiff's placement and retention on administrative segregation does not amount to a violation of a constitutionally protected right.

Plaintiff's allegation that the disciplinary proceedings resulted in the denial of parole fares no better. The Constitution itself does not create a protected liberty interest in the expectation of parole. *See Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U. S. 1, 7 (1979); *see also Jago v. Van Curen*, 454 U.S. 14, 18 (1981) (mutually explicit understanding that inmate would be paroled does not create liberty interest). "It is therefore axiomatic that because . . . prisoners have no protected liberty interest in parole they cannot mount a challenge against a state parole review procedure on procedural (or substantive) Due Process grounds." *Johnson v. Rodriguez*, 110 F.3d 299, 308 (5th Cir. 1997).

Additionally, the Maryland parole statute itself does not create a legitimate expectation of parole release because the decision whether to grant parole to any inmate is vested solely in the discretion of the Parole Commission. *See* Md. Corr. Serv. Code Ann., §§ 7-205(a)(1), 7-301, 7-

305 (1999); COMAR § 12.08.01.18 (2001).  No liberty interested is created by the Maryland

parole statute and no due process rights are implicated in these decisions.  *See Moss v. Clark*, 886

F.2d 686, 689 (4th Cir. 1989) (no fundamental right to parole or other form of early release);

*Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988) (no due process right to parole hearing).

Defendants are correctional staff who play no role in the decision to grant or deny parole.

Further the decisions to deny parole were based not solely upon Plaintiff's infraction history but

also upon the nature of his crime, his refusal to participate in programming, and his disregard for

authority.

    E.      Loss of Property/Access to Courts

    Prisoners have no legitimate expectation of privacy; therefore the Fourth Amendment is

not applicable to routine searches of prison cells.  *Hudson v. Palmer*, 468 U.S. 517 (1984).

Although Plaintiff alleges that his personal property, including legal materials were lost or

stolen, sufficient due process is afforded to a prisoner if he has access to an adequate post-

deprivation remedy.  *See Parratt v. Taylor*, 451 U.S. 527, 542-44 (1981), *overruled on other*

*grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  The right to seek damages and injunctive

relief in Maryland courts constitutes an adequate post-deprivation remedy.[10]  *See Juncker v.*

*Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[11]  As noted, above, even if Plaintiff's property was

improperly destroyed, such a claim does not rise to a constitutional violation.[12]

    To the extent Plaintiff alleges that the loss of property impeded his access to the courts,

---

[10]  Plaintiff may avail himself of remedies under the Maryland's Tort Claims Act and through the IGO.

[11]  Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property, given *Juncker's* reliance on *Parratt* in dismissing Plaintiff's due process claim.

[12]  It appears Plaintiff was reimbursed $75.00 for  the property lost on October 13, 2012, which included a fan, net bags, t-shirts, radio, earbuds, batteries, soap, food items, toothpaste, and stamps.  ECF No. 40-21, pp. 3-4.

his claim likewise fails.  Prisoners have a constitutionally protected right of access to the courts.

*See Bounds v. Smith*, 430 U. S. 817, 821 (1977).  However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'"  *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997), quoting *Lewis*, 518 U.S. at 355.  "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches."  *Lewis*, 518 U.S. at 349.  Plaintiff baldly claims that the loss of unspecified materials caused him voluntarily to dismiss his civil rights case then pending before this court.  Plaintiff offers his belief that he could not challenge a dispositive motion had it been filed by Defendants.  He fails to explain what materials were taken and how those materials were integral to his proceeding with a case that he ultimately dismissed.  Such an allegation of injury is too speculative to sustain his access to courts claim.  Thus, his claim fails.  *See Bernadou v. Purnell*, 836 F. Supp. 319, 325 (D. Md. 1994) (no showing of actual harm from confiscation of legal materials during shakedown).

F.      Conditions of Confinement

To the extent Plaintiff's claims are construed as a conditions of confinement claim, they too are subject to dismissal.   Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.   *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual."   *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008), citing *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded.   *See Wilson*, 501 U. S. at 298.   In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so."   *Brown v. North Carolina Dept. of Corrections,* 612 F.3d 720, 723 (4th Cir. 2010), quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002).   Conduct is not actionable under the Eighth Amendment unless it transgresses bright lines of clearly-established pre-existing law.   *See Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992).

The objective prong of a conditions claim requires proof of an injury.   "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must

produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Odom v. South Carolina Dept. of Corrections*, 349 F. 3d 765, 770 (4th Cir. 2003).

Plaintiff has not demonstrated that he suffered a serious or significant injury as a result of the alleged denial of showers from May 27, 2012 to June 12, 2012.[13] Further, Plaintiff's segregation records do not support his contention that he was denied access to showers during this time. Even assuming he was denied showers for two weeks, as alleged, there is no allegation, much less evidence that Defendants knew of an excessive risk of harm to Plaintiff's health or safety and disregarded it.[14]

---

[13] The absence of an injury alone is enough to defeat Plaintiff's claim. *See* 42 U.S.C. § 1997e(e) (barring inmate lawsuits where there is no showing of physical injury).

[14] Plaintiff's allegation that he was subjected to strip searches also fails. Strip searches in the presence of other inmates and staff are not per se constitutionally defective, in light of legitimate security concerns. *Fillmore v. Page*, 358 F. 3d 496, 505-6 (7th Cir. 2004) (discrete and expeditious strip search not unconstitutional because it is videotaped); *Elliott v. Lynn*, 38 F. 3d 188 (5th Cir. 1994) (visual body cavity search conducted in presence of other inmates and correctional staff reasonable in light of legitimate security concerns); *Franklin v. Lockhart*, 883 F.2d 654 (8th Cir. 1989) (strip search of inmates in segregation in view of other inmates justified in light of legitimate security concerns); *Michenfelder v. Sumner*, 860 F. 2d 328 (9th Cir. 1988) (strip search in hallway reasonable in view of legitimate security concerns are a regular part of legitimate prison security and are not per se constitutionally defective). The Fourth Circuit has held that strip searches of convicted persons do not amount to a *per se* violation of privacy rights, as long as the genitals of the persons being searched are not involuntarily exposed to members of the opposite sex. *See Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981); *see also Hudson v. Goodlander*, 494 F. Supp. 890, 891 (D. Md. 1980) ("[N]either an inadvertent encounter nor a regularly scheduled visit by a female employee at an announced time . . . rises to a level of a constitutional deprivation [of an inmate's right to privacy].").

An investigation of Plaintiff's complaint regarding the January 7, 2012 strip searched by Mason revealed two inmate witnesses who stated they observed Plaintiff with his pants down in the stairwell but did not see Mason in the vicinity. ECF No. 40-14, p. 4. Additionally, when interviewed, Mason stated he did not direct Plaintiff to remove his pants in the stairwell. *Id.*, p. 6. Other officers advised that they were with Mason the night of the

G.      ARP process

To the extent Plaintiff alleges there were problems with the processing of his administrative remedy requests, his claim likewise fails.  While the long standing rule has been that prisoners have no constitutional right to participate in an institutional grievance procedure, *see Adams v. Rice*, 40 F. 3d 72, 75 (4th Cir. 1994), with the passage of the Prison Litigation Reform Act (PLRA),  42 U.S.C. § 1997e(a), the issue is less clear.  The PLRA requires exhaustion of administrative remedies before a federal action concerning prison conditions may be filed by a prisoner.  The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Further clarification regarding exhaustion as a pleading requirement was announced by the United States Court of Appeals for the Fourth Circuit in *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F. 3d 674 (4th Cir. 2005), wherein the court held, "an inmate's failure to exhaust his administrative remedies must be viewed as an affirmative defense that should be pleaded or otherwise properly raised by the defendant."  *Id*. at 681.  To the extent that a prisoner's attempts to exhaust the administrative remedy process are thwarted by prison officials' misconduct, that evidence may be presented in response to the affirmative defense.  *Id*. at 682.  Thus, an inability to access the administrative remedy procedure based on an alleged refusal by prison officials to enforce the rules governing the process does not run afoul of the due process clause.  Assuming,

---

incident, Mason never went into the stairwell with Plaintiff as alleged, and the event simply never happened.  *Id*., p. 4.  The strip searches which Plaintiff complains of do not rise to a constitutional violation as they are not an atypical and significant hardship even if the court were to assume that Plaintiff was in the view of female officers during the alleged searches.  Even if the strip search occurred as alleged, it was in the stairwell, a discreet location, and by Plaintiff's account occurred quickly.  There is no evidence that any searches actually conducted were not in furtherance of institutional security. Moreover, Plaintiff has failed to demonstrate any injury.

*arguendo*, that Defendants did not satisfactorily investigate or respond to Plaintiff's remedy requests in a timely fashion, Plaintiff's claim fails as he has not alleged, much less demonstrated, any injury as a result of any failure to process his ARPs.

H.      Verbal abuse

"[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Verbal abuse of inmates by guards, including aggravating language, without more, states no constitutional claim. *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (sheriff laughed at inmate and threatened to hang him); *Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) (racial slurs); *Cole v. Cole*,633 F.2d 1083, 1091 (4th Cir. 1980) (no harm alleged from claimed verbal harassment and abuse by police officer). Accordingly, Plaintiff's allegations that Defendants used racist language toward him fails to state a claim. Likewise, any allegation that the Warden or other supervisory staff failed to take corrective action as to the officers' unprofessional conduct fails to state a constitutional claim.

I.      Equal Protection

Plaintiff baldly alleges that he was treated differently from other inmates. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U. S. 432, 439 (1985) (citation omitted). In cases where no suspect criterion such as race is involved, the proper inquiry is whether the statute or regulation serves a legitimate state interest and whether the challenged classification is rationally related to it. *See Moss v. Clark*, 886 F. 2d 686, 690 (4th Cir. 1989). Even in the case where a suspect class is involved, prison regulations must only meet a test of reasonableness; they are not subjected to strict scrutiny. *See Washington v. Harper*, 494 U.S. 210, 223 (1990) (rule of *Turner v. Safley* that regulations need only be reasonably related to legitimate

penological interest applies beyond First Amendment context); *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Plaintiff has failed to demonstrate he was treated differently than any other inmate who failed to follow prison rules.  Moreover, Plaintiff's bald allegations of discriminatory intent, as offered here, are insufficient to state an equal protection claim.  *See Beaudette v. City of Hampton*, 775 F. 2d 1274 (4th Cir. 1975).

K.      Violation of DOC Policy

To the extent Plaintiff alleges Defendants violated their own policies and procedures in processing his ARPs, providing him showers, delivering his meals, preventing his being seen by medical staff, writing him infractions, or in any other manner, his claim is without merit.  State regulations do no provide a basis for a due process violation.  *Weller v. Dept. of Soc. Services*, 901 F.2d. 387 (4th Cir. 1990); *see also Riccio v. County of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("[i]f the state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide that law is not a federal due process issue").

L.      Retaliation

Plaintiff's allegation of overall retaliation by staff at MCIH is unavailing.  His assertions regarding retaliation, as demonstrated above, do not appear to be events without independent, legitimate causes.  In order to prevail on a claim of retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right."  *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972).  Where there is no impairment of the Plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation.  Thus, a showing

of adversity is essential to any retaliation claim and "[a] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone."  *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D. N.C. 1996) (conclusory allegations of retaliation insufficient to state claim).

To make out a prima facie case of retaliation, Plaintiff has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of Defendants.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).   In the prison context, Plaintiff must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals.  *Rizzo v. Dawson*, 778 F.2d 527, 532 & n. 4 (9th Cir. 1985).   The preservation of internal order and discipline constitutes a legitimate goal of the correctional institution.  *Id*. at 532.  "In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'"  *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) quoting  *Rice*, 40 F.3d at 74.

While Plaintiff points to a pattern of conduct by MCIH staff which he baldly alleges was undertaken in retaliation for his filing inmate grievances, he has failed to state a claim and/or show injury or adversity as a result of the alleged conduct.  Moreover, the record demonstrates that the conduct of Defendants was in direct reaction to Plaintiff's flagrant rule violations and hostile attitude, which he does not deny.  Plaintiff "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial

or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  Plaintiff has failed to meet this burden.

**Conclusion**

The dispositive motion filed on behalf of Defendants will be granted.  Plaintiff's Complaint against Tasker shall be dismissed.  A separate Order follows.


Date:  <u>March 13, 2015</u>                             _____/s/_____
                                                         DEBORAH K. CHASANOW
                                                         United States District Judge